# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 29, 2022 Session

## STATE OF TENNESSEE v. NIKOS BURGINS

**Appeal from the Criminal Court for Knox County**
**No. 102103    Bob R. McGee, Judge[1]**

**No. E2021-00602-CCA-R3-CD**

FILED

MAY 2 6 2022

Clerk of the Appellate Courts
Rec'd by _BGoogn_

The Defendant, Nikos Burgins, appeals his conviction for solicitation of first degree murder and corresponding thirty-year sentence. The Defendant argues that (1) the trial court erred by qualifying three law enforcement officers as gang experts; (2) the court erred by allowing a layperson to offer expert testimony about handwriting; (3) the court erred by declining to issue an absent material witness instruction; (4) the court erred by admitting general gang evidence, including testimony regarding unrelated gang violence in a prison; and (5) the court should have granted his motion for judgment of acquittal due to insufficient evidence. After a thorough review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

John M. Boucher, Jr., Knoxville, Tennessee, for the appellant, Nikos Burgins.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Hector I. Sanchez and G. Lawrence Dillon, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

---

[1] Judge McGee retired in 2019 after the Defendant's sentencing; Judge Kyle A. Hixson presided over the Defendant's motion for new trial.

## FACTUAL BACKGROUND

The Defendant's conviction arises from a letter mailed from the Knox County jail on May 29, 2012, addressed to Norris Ray Harvey, an inmate at the Hardeman[2] County Correctional Facility (HCCF). The letter instructed Mr. Harvey to stab Lendell Davis, an inmate housed with Mr. Harvey who had testified against the Defendant in Knox County Criminal Court Case Number 97139.[3] The August 2013 term of the Knox County Grand Jury charged the Defendant with solicitation of first degree murder, a Class B felony. See Tenn. Code Ann. §§ 39-12-102, -13-202.

At trial, Tennessee Bureau of Investigation (TBI) Special Agent Mark Irwin testified that he investigated the letter the Defendant sent regarding Mr. Davis. Special Agent Irwin interviewed Mr. Davis, who was in solitary confinement in Hardeman County out of concern for his safety following the discovery of the letter at issue in this case. Special Agent Irwin obtained the letter from Correction Officer Bobby Howell and took the letter and envelope to the TBI laboratory in Nashville to be tested for DNA.

The envelope and letter were received as an exhibit. The envelope reflected that it was addressed to Mr. Harvey, including his inmate number, and that the Defendant's name and inmate number were written as the return address. The letter, which was handwritten in pencil in all capital letters, read[4] as follows:

Ray,

I come as I am with truth in my word's and love in my heart and the upmost respect to you lil homie. Look I lost my trial cause this rat as n---a took the stand and told and lie on me, and we had the case beat homie. . Look you can go to west law dot com and put my name in and my whole case will pop up or, tenn.gov.com/Knoxville and see how this b--ch a-- n---a took the stand on me as a witness for the State. . I got a blue light and and orange light on his brain. . . His name is Lendell Davis from Chatt Town and he say he's a G.D. . He call his self Spud or Spudy Mac, got gold in his mouth. Short n--

---

[2] The evidence indicated that the Defendant mailed the letter to the Morgan County Correctional Complex, from which Mr. Harvey had transferred to HCCF.

[3] The Defendant was convicted in that case of five counts of aggravated rape, four counts of especially aggravated kidnapping, and one count of aggravated robbery.

[4] The State also provided the jury with a transcription of portions of the letter. The trial court issued a limiting instruction that if the transcript varied from what the jurors saw in the original letter, they should accept the original letter's contents.

-a chuby brow skin real short fro. . . He's down were you at now but he's gettin classify. . . Tell Chuck that b--ch a-- n---a testify on me and he need to let all them G's no what he done. . . and to you homie it's a big homie call to take care of that n---a and spred the word around and tell T.P. what's up. . If we have any homie boy in there with that n---a tell them it's a OG call and for the hood thay must take care of it A.S.A.P. Stick on him smash him. And you make sure it get done by any meins cuz. . And I will see down there next month cuz I leave as I came with love and respect.

Love you

Giaconni

P.S. Bullet Proof Love

TBI Special Agent Jennifer Shipman, an expert in forensic biology, testified that she and a latent print examiner worked together to examine the letter and envelope. After testing the items with a substance that reacted to oils present on skin, Special Agent Shipman took DNA swabs of the areas not containing any latent prints. Samples from the envelope yielded a partial DNA profile, which she compared to a DNA swab taken from the Defendant. A complete DNA profile in 2012 consisted of fifteen DNA strand locations; the partial profile obtained from the envelope contained six locations. The six locations matched the Defendant's DNA. Special Agent Shipman noted that other locations were present in insufficient quantities to include in the DNA profile. However, she could use the locations to exclude a person as the contributor. Special Agent Shipman stated that she was unable to exclude the Defendant as a contributor using these other locations. Special Agent Shipman testified that the probability of another person's having been the DNA contributor instead of the Defendant was 1 in 625 million in the African American population, 1 in 492 million in the Caucasian population, and 1 in 1 billion in the Southwestern Hispanic population.

On cross-examination, Special Agent Shipman testified that the DNA was not degraded, and she clarified that a portion of her report referring to "insufficient or degraded DNA" signified insufficient amounts of DNA. Special Agent Shipman acknowledged that in some out-of-state cases, convictions had been overturned as a result of techniques used to obtain DNA profiles from very small samples. She stated that she did not use any of these techniques in the Defendant's case. Special Agent Shipman explained that the probabilities she cited were based upon a statistical tool produced by the Federal Bureau of Investigation using data about common DNA markers in various demographic populations.

HCCF Officer Bobby Howell, an expert in gang investigations, testified that he had been a Security Threat Group (STG) Officer, or gang officer, for fifteen years. He agreed that he could identify gang members by the words they used when speaking and writing to one another. He obtained information about gangs at the prison using incoming and returned mail and telephone calls. Officer Howell explained that all incoming mail was screened by the prison mail room for contraband and flagged if it was "suspicious, gang-related, or a threat to security." He noted that this was Tennessee Department of Correction (TDOC) policy in order to identify gang members and prevent "incidents."

Officer Howell testified that during his tenure, inmates had injured and killed one another. He elaborated that in the past, an inmate had killed his cellmate "based on charges and him going on about his charges" and that in another unspecified incident, an inmate assaulted and killed another inmate.

Officer Howell testified that on June 14, 2012, the mail room flagged and forwarded to Officer Howell a letter addressed to Mr. Harvey with the Defendant's information on the return address. The letter had been forwarded to HCCF from the Morgan County Correctional Complex, where Mr. Harvey had been housed prior to his transfer to HCCF. Officer Howell verified that Mr. Davis was in protective custody, and Officer Howell kept the letter until the TBI could collect it.

Officer Howell stated that the letter indicated that Mr. Davis had testified against the letter's author and that the author was angry. When asked about the meaning of "blue light and orange light on his brain," Officer Howell stated that he had never seen similar phrasing in a letter before or after this incident. He said, "[G]enerally when a gang member issues . . . a green light or a blue light as it's indicated here, . . . it's giving permission to attack this person . . . . The fact that it says, 'I've got a blue light and an orange light on his brain,' that indicates something far more serious." Relative to the language about an "OG call," Officer Howell stated that it "indicated that the inmate writing the letter . . . [was] high ranking in the 107 Hoover Crip gang. And with them issuing that order out, it was highly likely to be . . . taken care of because of the rank." He agreed that rank was taken seriously in gangs. Officer Howell stated that the phrase "It's a big homie call" also indicated that the author had a high gang rank. He added that instructing the reader to spread the word around meant for the reader to let "all of his members know" that the matter had to be addressed. Officer Howell said that to "[s]tick on" someone meant to stab him. He opined that the author's instruction to "get it done by any means" conveyed the author's seriousness. Officer Howell acknowledged that the author did not use the words "murder" or "kill." He stated that in his experience, gang members used code instead of direct language to prevent law enforcement from discovering information.

Officer Howell opined that the letter was written by the Defendant to Mr. Harvey, a fellow 107 Hoover Crip, and that the Defendant claimed to have authority to direct Mr. Harvey. When asked whether the letter ordered Mr. Harvey to kill Mr. Davis, Officer Howell responded, "He would have tried."

On cross-examination, Officer Howell testified that he received the letter from a mail room employee at HCCF. He acknowledged that he had never seen the terms "blue light" and "orange light" before; he indicated that he could take other steps to interpret a letter, like sending it to the TDOC to be deciphered. Officer Howell agreed that interpreting the codes at issue involved assigning different meaning to ordinary words. He said that he sent the letter to his supervisor, STG Special Agent Paul Flanders, but that Officer Howell "took the meaning as what it was."

Retired STG Special Agent Flanders, an expert in criminal gang identification and investigation, testified that certain gangs used distinctive writing patterns; for example, a Crip member never used the letter "c" beside the letter "k" because "C-K" was Blood slang for "Crip Killer." Accordingly, a Crip member would spell "back" as "bacc." Special Agent Flanders had previously investigated situations in which inmates harmed or killed other inmates. He gave as an example an incident in which an inmate "involved with Aryan groups" stabbed another inmate who was also involved with Aryan groups, although the motivation for the killing was undetermined. Special Agent Flanders agreed that one of the STG's tasks was to uncover plots to harm inmates and that they routinely screened incoming mail at the prison. He stated that the STG exchanged information about gangs with other law enforcement agencies.

Special Agent Flanders testified that Officer Howell called him after discovering the letter in this case and that he instructed Officer Howell to maintain custody of it. Although he did not remember Officer Howell's scanning him a copy of the letter, Officer Howell generally sent him copies of documents to review.

Upon reviewing the contents of the letter, Special Agent Flanders agreed that the letter addressed Mr. Davis's having "turned State's evidence" against the author. Special Agent Flanders noted that the author's identifying "a blue light and an orange light" indicated approval from the Hoover Crips, represented by orange, and "the Crips at large," represented by blue. Special Agent Flanders interpreted the phrase "on his brain" to mean, "[H]it him hard[.]" When asked to explain the phrase "OG call," Special Agent Flanders stated that "this [was] an order to be taken seriously. It's coming from up high, basically." He agreed that a person of OG rank had the authority to make "this particular demand" and that to "get it done by any means" meant that it was "a valid order and it better get done." Similarly, referring to a "big homie" and "little homies" invoked gang rank. He noted that the phrase "For the hood" indicated that the action was for the gang. Special Agent

Flanders said that the letter instructed Mr. Harvey to make sure that people knew Mr. Davis had testified for the State. He stated that to "stick" someone meant to stab them with a prison-made knife and that to "smash" someone meant to attack him. He noted that Crip members customarily called one another "cuz."

Special Agent Flanders agreed that the words kill or murder did not appear in the letter. He stated that gang members in prison knew their letters were monitored, that such words would "stick out" to prison staff, and that the gang members communicated in code to "imply" their true meaning.

On cross-examination, Special Agent Flanders testified that the literature to which he referred on direct examination contained the history and procedures of a gang. He stated that relative to rank, "OG" stood for "original gangster" and that "it [went] up from there as well." He agreed that he had examined portions of the relevant letter and that he would need to read the entire letter to ascertain its meaning.

On redirect examination, Special Agent Flanders testified that he had read the entire letter and that it "had the most statements of a letter like this that [he had] seen where [it was] pointing them to take some action against somebody." He noted that in the letter, the author told Mr. Harvey to "get with the Gangster Disciples to kind of clear the way" for the attack. Special Agent Flanders explained that according to prison politics, repercussions would generally follow if a member of one gang attacked a member of another gang. However, the letter told Mr. Harvey to go to the Gangster Disciples in the prison and inform them that Mr. Davis had testified for the State before the "hit" took place.

Knoxville Police Department (KPD) Investigator Jim Quick, an expert in gang identification and investigation, testified that he had been assigned to the KPD Gang and Intelligence Unit for the past twenty-three years. He stated that the Crips originated in Los Angeles, California in the 1960s and that to his knowledge, it came to Knoxville in the mid 1980s. He recalled seeing Crip graffiti when he was in high school. Investigator Quick stated that several "sub gangs" of the Crips existed and that the Hoovers were "actually a kind of a subset of the Crips, although they [were] a separate entity" that existed before the Crips were established.

Investigator Quick testified that he used state law and his department's "point scale system" when determining whether a person was a gang member. A person would be assessed points for "[t]attoos, hand signs, symbols, associates, correspondence . . . , any kind of outside agency that may have verified the same person such as TDOC." The TDOC considered a person with ten points or more to be a confirmed gang member. Investigator Quick affirmed that the Defendant was a confirmed member of the "107 Hoover Crips" and an "admitted triple OG[,] which [was] a pretty high rank in the Hoovers."

Investigator Quick affirmed that he reviewed the letter in this case, which he described as "basically soliciting [the] murder of Mr. Davis." He stated that the phrase "little homie" referred to a lower gang rank in which a person had to obey the orders of any higher ranked gang member. Investigator Quick stated that referring to a blue light and an orange light on Mr. Davis's brain "would be a reference to a hit and more than likely it's a homicide not just a simple assault." When asked to explain why he believed the phrasing indicated a homicide rather than an assault, Investigator Quick stated,

> There's a couple of things in that statement. Number one, there's two lights. And normal people would probably do a green light, but with this being a Hoover, the colors are normally orange. The 52 Hoovers add the blue in. So they'll have blue and orange as their colors.
>
> So in this case, it tells you [that] you have a blue light and an orange light which would say that there's basically . . . two sanctions for that hit, which is unusual for just a simple assault. That would be something a lot more serious.
>
> . . . .
>
> The addition . . . of brain in that also kind of tells you it's a little more than just an assault. You know, when you're wanting to get somebody's brain, that's a . . . pretty serious event.

Investigator Quick testified that the letter referred to Mr. Davis's being a "GD," which meant Gangster Disciple, and that Mr. Davis's nickname included "Mac," which typically identified the person as a Gangster Disciples member. He noted that the author wanted to avoid trouble between the Crips and the Gangster Disciples by informing them that because Mr. Davis testified, "he deserves what he gets."

Investigator Quick testified that an OG call referred to an order given by a "pretty high rank" member. He stated that to "stick" someone in a prison setting was to stab him with a shank. He noted that "Cuz" was a term Crip members used to refer to one another.

Investigator Quick testified that he reviewed another letter authored in 2014 by the Defendant to examine similarities between the two letters and verify the author. He stated that the opening and closing statements in the letters were similar and opined that the penmanship in both letters looked similar.

Three exhibits comparing the 2012 and 2014 letters were entered. The first exhibit was a document entitled "Consistency in Writings," which contained two photocopied

snippets of text. The first, labeled "Solicitation Letter from 2012 to Norris Harvey," showed handwriting in all capital letters reading, "I leave as I came with love and respect. Love you[,] Giaconni." The second, labeled "Letter to Lakrystal Goss from 2014," showed a similar handwriting in all capital letters reading, "And I leave you the same way I came with love and respect. Love you[,] Giaconny."

The second exhibit was a document entitled "First Sentence of Letter Lakrystal Goss, dated July 24, 2014," which contained a photocopied snippet of handwritten text in all capital letters and typewritten text above it. Both texts read, "Blu Krys, I come as I am with truth in my words and love in my heart, and the upmost respect to you lil-sis."

The third exhibit was a document entitled "First Sentence of Solicitation Letter, dated May 29, 2012," which contained a photocopied snippet of handwritten text in all capital letters and typewritten text above it. Both texts read, "Ray, I come as I am with truth in my words and love in my heart and the upmost respect to you lil[5] homie."

On cross-examination, Investigator Quick testified that his opinions were based upon "a conglomeration" of work from TDOC, KPD, Knox County Sheriff's Office, and the Tennessee Gang Investigators Association (TGIA). He agreed that he and Special Agent Flanders were part of the group that established the TGIA.

Upon this evidence, the jury convicted the Defendant as charged. At the sentencing hearing, the parties announced an agreed sentence of thirty years as a Range IV, Career Offender, to be served concurrently with the sentence in Knox County Case Number 97139. The trial court accepted and imposed the agreed sentence, noting that Case Number 97139 was pending appellate review and that the court would revisit the sentence if Case Number 97139 was modified or reversed on appeal.

At the motion for new trial hearing,[6] the Defendant argued that the evidence was insufficient relative to the State's foundation for the 2014 letter, stating that "an exemplar reported to be that of [the Defendant] was entered into evidence over our objection without an expert present to compare handwriting." Defense counsel clarified that neither the 2012 nor 2014 letter were authenticated as having been authored by the Defendant. Next, the Defendant argued that without the HCCF mail room employees' testimony, the chain of

---

[5] The typewritten text spelled out the word "little," but the photocopy reflected that the author wrote "lil."

[6] The motion for new trial hearing transcript was not included in the record on appeal. However, it was included in the appellate record for the Defendant's other case before this court in Knox County Case number 97139. Our review of that record indicates that the trial court conducted a joint motion for new trial in cases 97139 and 102103. We may take judicial notice of our own court's records. See State v. Lawson, 291 S.W.3d 864, 869-70 (Tenn. 2009).

custody of the 2012 letter was incomplete. The Defendant also argued that no expert testified who could translate the "slang" in the 2012 letter, leaving the jury "to make their decision based on what we think this meant, what we think this was supposed to mean, what typically this means." Defense counsel noted that Mr. Harvey never received the 2012 letter and that the "communication part of this offense wasn't present." The Defendant argued that Mr. Harvey was "the one person that was required to be present and testify to the jury, and that just didn't happen." He averred that the trial court refused to issue an absent material witness jury instruction, and if the jury had been permitted to infer that Mr. Harvey's testimony would have been prejudicial to the State, "that was key."

The State responded that the evidence was sufficient, noting the DNA evidence on the 2012 envelope and the testimony of Officer Howell, Special Agent Flanders, and Investigator Quick corroborating that the letter was signed by the Defendant "under an alias." Relative to the 2012 letter's authentication and chain of custody, the prosecutor explained that the prison mail room employees were no longer employed as such at the time of trial, that Special Agent Irwin adequately explained the chain of custody, and that he identified the 2012 letter as the one he collected and sent to the TBI. The State averred that Officer Howell, Special Agent Flanders, and Investigator Quick were properly qualified as experts. The State reiterated that the solicitation statute also applied to an attempt to solicit.

The trial court denied the motion for new trial, finding that "sufficiency of the evidence [was] not a cognizable claim in a motion for new trial."[7] The court also found that the chain of custody of the 2012 letter was adequately established and that the authenticity of the 2012 letter was also proven by the DNA evidence. The court noted Officer Howell's trial testimony that he opened the letter[8] and secured it after contacting Special Agent Flanders. The court found that the gang testimony was properly admitted and that the experts' qualifications were evident from the record. The court stated that the jurors would not have known the meaning of the gang-related terminology in the 2012 letter and that the expert testimony translating the letter could substantially assist them. The court noted that the jurors were able to credit the testimony as they deemed fit. Relative to the absent material witness instruction, the court found that Mr. Harvey never received the letter and consequently would not have had material testimony. After the court denied the motion for new trial, the Defendant filed a timely appeal.

---

[7] This is incorrect. However, because this court does not waive consideration of issues of sufficiency of the evidence and sentencing even in the absence of a motion for new trial, it does not affect our review of the Defendant's sufficiency issues on appeal.

[8] Officer Howell did not testify that he opened the letter but rather that a mail room employee gave him the letter after reading it and becoming concerned about its contents.

- 9 -

## ANALYSIS

On appeal, the Defendant argues that the trial court erred by (1) qualifying Officer Howell, Special Agent Flanders, and Investigator Quick as gang experts; (2) allowing Investigator Quick to offer expert testimony about handwriting; (3) declining to issue an absent material witness jury instruction; (4) admitting certain gang evidence, including testimony regarding unrelated prison gang violence; and (5) denying the Defendant's motion for a judgment of acquittal due to insufficient evidence. We will address each in turn.

### I.    Expert Testimony

First, the Defendant claims that the trial court erred by allowing Officer Howell, Special Agent Flanders, and Investigator Quick to testify as experts in gang identification and investigations, arguing that no gang experts exist in Tennessee. The Defendant argues as follows:

> In the present case as with each and every other "gang expert case," it appears to be a foregone conclusion that the mere statement that a law enforcement witness knows some basic "lingo" and gang structure, he/she is automatically an "expert." In Tennessee, the "Gang Experts" are simply a group of Law Enforcement Officers who got together in 1998 and decided they were experts. They formed an organization called the Tennessee Gang Experts Association, and they have a boondoggle of a seminar once a year at a resort or casino. None of the "experts" ever published anything. No degree exists. No licensure requirements exist. This entire genre of experts rely upon zero science. In [The Defendant's] case, not a single "expert" has ever published anything or taken any coursework to further their knowledge of Gangs. None. No science exists. No data is ever discussed. The testimony seems to revolve around conclusory opinions without any verified data at it[s] foundation.

The State responds that the officers were properly qualified as experts by the trial court in its discretion. The State notes that this court has previously rejected the Defendant's argument regarding the existence of gang expertise.

Tennessee Rule of Evidence 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." An expert may base his opinion upon facts or data imparted to or perceived by the expert prior

to or at a hearing, and the facts or data need not be admissible if they are the type of facts or data reasonably relied upon by experts in the particular field. Tenn. R. Evid. 703. The trial court shall disallow testimony in the form of an opinion if the underlying facts or data indicate a lack of trustworthiness. Id. Moreover, expert testimony must be both relevant and reliable before it may be admitted. McDaniel v. CSX Transp., 955 S.W.2d 257, 265 (Tenn. 1997). "Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). This court will not overturn the trial court's ruling regarding the admissibility of expert testimony absent an abuse of discretion. Id.

Before trial, the State put on an offer of proof relative to Investigator Quick's qualifications and anticipated testimony, as well as the admissibility of the 2012 letter. At the hearing and at trial, Investigator Quick testified that he had worked with the KPD for twenty-five years, twenty-three years of which was in gang investigations. He was assigned to the first KPD gang task force in 1996. In 1998, he, Special Agent Flanders, and others formed the TGIA and in 2011, he became its president. Investigator Quick had sat on the board of the National Alliance of Gang Investigators Association since 2011 and was its treasurer at the time of trial. He had completed more than 400 hours of gang training, and he taught gang training courses to school and neighborhood groups. He had been certified as an expert in gangs in Knox and Hawkins County courts, federal court, and state juvenile court. Although Investigator Quick had not been published, he had served as a reviewer on books authored by other gang investigators.

At the offer of proof, defense counsel cross-examined Investigator Quick. He acknowledged that he based his opinions of the Defendant's gang membership on reports authored by other individuals. He stated, though, that he interpreted the 2012 letter independently. He agreed that he had only examined a photocopy of the letter.

When asked whether his expertise was based upon "hard science," Investigator Quick responded, "Not really. A lot of it's . . . research, a lot of it's talking to gang investigators across the country, staying up on the trends which change all the time. As well as going to different trainings around the country, different specializations and also . . . interviewing different gang members." He agreed that the letter at issue was written in English "[t]o a point," explaining that it contained "some code" that most people might not understand.

At trial, Officer Howell testified that he had been an STG Officer for fifteen years. He stated that he began working at HCCF in 1997 and became an STG officer in 2004. He had been a member of the TGIA since 2006, attended annual TGIA conferences, and was awarded the TGIA Investigator of the Year award in 2011 and the TDOC Investigator of

the Year award in 2014. Officer Howell testified that he identified gang members by checking for tattoos, interviewing the individuals, and examining a person's criminal history and known associates.

Upon examination by defense counsel, Officer Howell testified that he completed a twenty-four-hour training course every year, as well as other periodic trainings. He acknowledged that he was not a supervisor in his job, that he had no published papers, and that he did not teach.

Special Agent Flanders testified at trial that he began his career at Brushy Mountain Prison in 1986, that he was an STG coordinator and investigator there for nine years, and that he had served as TDOC's STG director in Nashville. He then served as an STG Special Agent in East Tennessee for four years before he retired in 2016. Special Agent Flanders had testified as an expert previously; he was recognized as an expert by his peers; and in 2015, the FBI recognized him for "counter-terrorism" work. He also served as a board member of TGIA. He stated that he identified gang members by the "use of symbols, colors, . . . [or] material literature" in the inmate's possession. Defense counsel did not examine Special Agent Flanders before the trial court certified him as an expert.

First, the State aptly observes that gang activity is a recognized area of expertise in Tennessee's courts. See State v. Justin Mathis, No. W2005-02903-CCA-R3-CD, 2007 WL 2120190, at *9 (Tenn. Crim. App. July 20, 2007) (citing United States v. Hankey, 203 F.3d 1160, 1169 (holding that a police officer was qualified to testify as "gang expert"); State v. Montea Wilson, No. W2000-00748-CCA-R3-CD, 2002 WL 925255, at *5 (Tenn. Crim. App. May 3, 2002) (noting that a correctional employee was qualified at trial as an expert on gang affiliation)); see also State v. Bonds, 502 S.W.3d 118, 143-44 (Tenn. Crim. App. 2016). The Defendant's argument to the contrary is not well-taken.

The Defendant's assertion that an expert may not be qualified in subject areas not governed by the scientific method fundamentally misconstrues the plain language of Rule 702, which specifically includes that expertise may be based upon "other specialized knowledge." Our supreme court has observed that an expert witness "may acquire the necessary expertise through formal education or life experiences." State v. Reid, 91 S.W.3d 247, 302 (Tenn. 2002). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." Id.

In addition, we note that the Defendant's claim that none of the expert witnesses had taken continuing education courses is not supported by the record. Defense counsel himself elicited information about Officer Howell's completing an annual twenty-four-

hour gang training, and Investigator Quick testified to having around 400 hours of continuing education trainings. In this case, the trial court properly exercised its discretion and found that the gang experts possessed ample experience that gave them knowledge beyond the scope of an average person about gangs. The Defendant is not entitled to relief on this basis.

## II. Handwriting Testimony

The Defendant contends that the trial court erred by allowing Investigator Quick to testify as a "hand writing expert," citing Tennessee Rule of Evidence 901(b)(3), which states that a document may be authenticated by "[c]omparison by trier of fact or by expert witnesses with specimens which have been authenticated." The State responds that this issue has been waived for failure to contemporaneously object.

During the pretrial offer of proof in which the State introduced the 2012 letter and examined Investigator Quick, the trial court asked the prosecutor how he planned to establish the Defendant as the letter's author. The prosecutor responded, "Through his handwriting," noting that the Defendant wrote his name on "both envelopes." The court asked if the State would have a handwriting expert testify, and the prosecutor responded negatively. He stated that pursuant to Tennessee Rule of Evidence 901(b)(4), the 2012 letter could be authenticated because it contained "[d]istinctive [c]haracteristics" that would be illustrated by the 2014 letter. A second prosecutor interjected and elaborated that the State was "not just simply . . . comparing the script" but rather "comparing whether this sender is the sender." The second proscutor elaborated that the State would present evidence that a third party could not have authored the letter using the Defendant's name due to the prison's regulation of mail.[9]

The first prosecutor continued and stated that the only item it intended to introduce from the Defendant's "gang file" was the 2014 letter authored by the Defendant. The State noted its belief that

> Investigator Quick[,] or any other investigator involved in this case, would be able to testify as to the consistency in the handwriting. [Tennessee Rule of Evidence 901(b)(2)] actually allows a lay person to testify about the consistency of the handwriting, the characteristics of it, the way that both letters are authored, in all capitals as well as the way that the first and last sentence of both letters are relatively exact.

---

[9] We note that no such evidence was presented at trial.

- 13 -

After the offer of proof concluded, the State reiterated that Investigator Quick could testify to the consistency of the handwriting between the 2012 letter and the 2014 letter. The prosecutor added that Officer Howell would be testifiying as the person who intercepted the 2012 letter and that the Defendant's DNA was on the envelope.

Defense counsel argued that a handwriting expert was required to compare the 2012 letter with other written correspondence that had been postively identified as the Defendant's handwriting. Counsel also argued that a lay opinion would be irrelevant given the DNA evidence. The State reiterated that a lay opinion would be admissible pursuant to Tennessee Rule of Evidence 901(b)(4) as exhibiting "[d]istinctive characteristics and the like."

The trial court noted that using writing with all capital letters was "a technique people use[d] to eliminate all of the individual characteristics that a . . . handwriting expert utilizes in making the comparisons." The court found that Investigator Quick's lay opinon was inadmissible to authenticate the 2012 letter because Tennessee Rule of Evidence 901(b)(2) addressed a "[n]onexpert opinion as to the genuineness of handwriting based upon familiarity not acquired for the purpose of litigation." The court noted that Investigator Quick's familiarity with the Defendant's handwriting was "couched entirely in the context of this litigation." The State noted that it would not seek to prove the content of the other letter and instead would identify "the unique characteristics that [were] similar regarding . . . the block letters."

At this point, defense counsel said, "Your Honor, we may ask for a redaction if it's just certain portions of a letter with our standing objection that . . . it would be inadmissible." Counsel noted that he had not been permitted access to the Defendant's gang file. The trial court indicated that it would handle evidentiary objections as they were raised.

During Investigator Quick's trial testimony, when the State began to examine him about the 2014 letter, the parties had a brief bench conference out of the hearing of the jury. Defense counsel stated,

> If they want to use this letter to show that it's written in the same font, then take a few words out and compare them. The rest of this letter is not necessary. It's irrelevant. If it is relevant, I think it's prejudicial. I just – I don't know the need for this letter.

The State responded that the 2014 letter was meant to show the consistency of the handwriting and that it was also sent from someone claiming to be the Defendant. The prosecutor noted that the 2012 and 2014 letters began and ended "with the same stylistic

- 14 -

approach." Upon questioning by the trial court, the prosecutor denied that the Defendant admitted to commiting any other crimes in the letter. After a brief exchange, the trial court instructed the State to redact the letter to show only its beginning and end. Defense counsel renewed a late discovery objection for the record, and trial proceeded.

The Defendant has stated his issue differently throughout the course of this litigation. At the pretrial offer of proof, the Defendant's objection was that a handwriting expert was necessary to authenticate the 2012 letter using the 2014 letter. During Investigator Quick's trial testimony, defense counsel requested that the 2014 letter be redacted and reiterated a "standing" objection to admissibility in general. In the motion for new trial, the Defendant raised that the trial court erred by overruling the Defendant's objection to comparing the handwriting of the 2012 and 2014 letters without a handwriting expert, as well as by denying the Defendant's motion to dismiss based upon the State's failure to establish a foundation for the 2012 letter.[10]

In his appellate brief, the Defendant set forth the following statement relative to this issue: "The trial court erred by allowing lay persons without any previous familiarity of [the Defendant's] writing to testify as 'hand writing experts.'" The body of the Defendant's argument cites to Tennessee Rule of Evidence 901(b)(3) allowing authentication based upon a "comparison with an authenticated specimen by an expert witness." He argues that the State "presented expert testimony through lay persons" and that a lay opinion must have as its foundation the witness's familiarity with the author's penmanship. At oral argument, defense counsel argued that the trial court improperly allowed Investigator Quick to testify as a handwriting expert, that the State did not lay a proper foundation for lay handwriting testimony, and that the 2012 letter was inproperly authenticated due to gaps in the chain of custody.[11]

We note that it is the responsibility of the Defendant to clearly set forth the issues and supporting law in his appellate brief. See Tenn. R. App. P. 27(a). An issue "must be included in the Statement of Issues Presented for Review as required by Tennessee Rules of Appellate Procedure 27(a)(4)" to be properly before this court. Teddy Ogle v. State, No. E2018-01520-CCA-R3-PC, 2019 WL 2355033, at *1 (Tenn. Crim. App. June 4, 2019) (quoting Hawkins v. Hart, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001); see Bunch v. Bunch, 281 S.W.3d 406, 410 (Tenn. Ct. App. 2008)). Accordingly, an issue which is raised only in the argument section of a brief, such as the Defendant's contentions related to

---

[10] Our review of the record indicates that this probably refers to the Defendant's motion for a judgment of acquittal, during which he argued that the 2012 letter should have been suppressed for failure to establish the chain of custody.

[11] The State correctly noted at oral argument that because the Defendant did not include a freestanding chain of custody issue in his appellate brief, it has been waived.

Investigator Quick's suitability as a lay witness to identify the Defendant's handwriting, is waived.

Turning to the Defendant's issue as articulated in his statement of issues—whether the trial court erred by allowing Investigator Quick to testify as a handwriting expert—the record does not reflect that the court certified Investigator Quick as a handwriting expert. Moreover, Investigator Quick offered no opinions that would be within the purview of a handwriting expert. His observations comparing the 2012 and 2014 letters were limited to identifying a general consistency in penmanship and acknowledging that the letters used nearly identical wording in their opening and closing sentences. Our review of the trial exhibits confirms that these this would have been readily apparent to the jury without any additional training or expertise. The Defendant is not entitled to relief.

### III. Absent Material Witness Instruction

The Defendant contends that trial court erred by declining to issue a special jury instruction regarding three absent material witnesses, Angela Hembree, Rachael Flint, and Ann Houston. The State responds that the Defendant made no written request for such an instruction, that the Defendant only raised this issue in his motion for new trial relative to Mr. Harvey, and that he has consequently waived this issue.

We note that at oral argument, defense counsel identified Mr. Harvey and the three above-referenced mail room employees as the missing witnesses. However, in his appellate brief, the Defendant only names Ms. Hembree, Ms. Flint, and Ms. Houston. Similarly, in the motion for new trial, the Defendant only names Mr. Harvey. He has waived plenary review of this issue.[12] See Tenn. R. App. P. 3(e) (treating issues "upon which a new trial is sought" as waived "unless the same was specifically stated in a motion for a new trial"); see also State v. Harbison, 539 S.W.3d 149, 164 (Tenn. 2018) (citations omitted); Tenn. R. App. P. 36(a).

In addition, the Defendant writes in his appellate brief that he did, in fact, make an oral request for the instruction and that he "would seek to supplement the record on this issue with transcripts discussing [jury] instructions." We note that the Defendant has filed

---

[12] We note that in the appellate brief, the Defendant's recitation of the standard of review for this issue reads, "Alleging instructional errors require[s] a plain error review. In evaluating Instruction Errors under the plain error standard, the Appeals Court shall conduct a de novo review of the trial court's application of the law to the facts." The Defendant cites State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001), which is a case in which our supreme court stated that we review de novo a trial court's application of the law to the facts in a motion to suppress. Lastly, the Defendant sets forth the five plain error factors. We interpret this portion of the appellate brief as an acknowledgment that the issue was not properly preserved for plenary review.

no motion to supplement the record in this court. The Defendant bears the burden of preparing an adequate record on appeal, including transcripts of all parts of the proceedings "necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b); see Timothy A. Baxter v. State, No. W2019-00590-CCA-R3-CD, 2020 WL 41926, at *2 (Tenn. Crim. App. Jan. 3, 2020) (citing State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993)).

Regardless, it is not necessary for this court to supplement the record sua sponte because the record is sufficient for us to conclude that the Defendant is not entitled to plain error relief. The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

The technical record contains no written requests for special jury instructions. See Tenn. R. Crim. P. 30(a) (providing that a party may file written requests for special jury instructions at the close of evidence or an earlier time during trial as directed by the trial court). The only discussion of special jury instructions was the trial court's asking if the parties wanted to request any instructions, to which defense counsel responded negatively. The remainder of the trial transcript does not allude to any unrecorded conversations on the subject.

The Defendant has not provided this court with a record clearly establishing what occurred in the trial court. Ms. Hembree, Ms. Flint, and Ms. Houston were listed as potential witnesses in the indictment, and the trial court read their names at the beginning of jury selection. However, it is unclear whether the three women were subpoenaed to court and whether they were unavailable to the Defendant for any reason. It is similarly unclear what respective roles they played in intercepting the 2012 letter; the Defendant

admits in his appellate brief that the women "may or may not have intercepted the key piece of evidence."[13] The Defendant is not entitled to plain error relief.

## IV. Gang Evidence

The Defendant contends that the trial court erred by allowing testimony about the history of gangs and violent acts perpetrated in prisons by other gangs, citing this court's opinion in State v. Jeremy Reynolds, No. E2018-01732-CCA-R2-CD, 2020 WL 3412275 (Tenn. Crim. App. June 22, 2020). The Defendant identifies two instances of such testimony: Investigator Quick's naming various gangs in Knoxville and Special Agent Flanders's recounting an incident in which one member of an Aryan gang stabbed another gang member to death. The State responds that this issue has been waived.

As a preliminary matter, the State correctly observes that the portion of Investigator Quick's testimony quoted by the Defendant occurred during the pretrial offer of proof. During the offer of proof, Investigator Quick testified that Knox County had "[j]ust about every [gang] that you hear [about] on the news," such as Crips, Bloods, Gangster Disciples, Vice Lords, Aryan Nation, "skin heads," and "motorcycle groups." The record reflects that Investigator Quick did not name the various local gangs in front of the jury. The Defendant's issue in this regard is without merit.

Proceeding to the Defendant's next issue, we agree with the State that the Defendant did not lodge a contemporaneous objection to Special Agent Flanders's testimony or raise it in his motion for new trial. The Defendant has waived this issue. See Tenn. R. App. P. 3(e); 36(a). Moreover, the Defendant is not entitled to plain error relief because no clear and unequivocal rule of law was violated. After the Defendant filed his appellate brief, our supreme court reversed this court's decision in Reynolds, concluding that gang testimony of a greater quantity, some of which was erroneously entered, did not warrant relief upon plenary or plain error review. See State v. Reynolds, 635 S.W.3d 893, 919-32 (Tenn. 2021). The Defendant is not entitled to relief on this basis.

## V. Sufficiency

The Defendant contends that the trial court erred by denying his motion for a judgment of acquittal[14] because insufficient evidence existed relative to the Defendant's

---

[13] We note that at oral argument, defense counsel referred to a chain of custody issue that is obliquely referenced in the appellate brief. The Defendant did not include a freestanding chain of custody issue in this appeal, and he has waived any such issue.

[14] We note that relevant to this appeal, the Defendant's motion for judgment of acquittal only raised Mr. Harvey's not having received the letter. However, the Defendant raised the remaining sufficiency issues in

intent for Mr. Harvey to kill Mr. Davis instead of merely assaulting him; the Defendant's authority to order a murder by virtue of his gang rank; the letter's actually having been received by the target of the solicitation, Mr. Harvey; and the Defendant's having authored the letter. The State responds that the evidence was sufficient. We agree with the State.

A motion for judgment of acquittal raises a question of law, i.e., the legal sufficiency of the evidence, for determination by the trial court. State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995) (citing State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)). Thus, on appeal, this court applies the same standard of review both to the trial court's denial of a motion for a judgment of acquittal and to the sufficiency of the convicting evidence underlying the jury's verdict. State v. Carroll, 36 S.W.3d 854, 869 (Tenn. Crim. App. 1999) (citing State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998)). An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court

---

his motion for new trial. We review sufficiency issues raised in a motion for new trial using the same standard as those in a motion for a judgment of acquittal.

"on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Tennessee Code Annotated section 39-12-102(a) provides that whoever, "by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense, or attempts to command, request or hire another to commit a criminal offense, with the intent that the criminal offense be committed, is guilty of the offense of solicitation." The Sentencing Commission Comments to section 39-12-102 state that "the defendant must intentionally try to enlist another in criminal activity and must intend that the offense be committed[;] . . . however, the solicitation need not succeed."; See Tenn. Code Ann. § 39-12-102(b).

First degree murder is defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" means that an act is "done after the exercise of reflection and judgment" and that "the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). A person acts intentionally when "it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

The Defendant first argues that the State failed to prove that the Defendant intended for Mr. Harvey to kill Mr. Davis. In the light most favorable to the State, a reasonable jury could have found that the Defendant directed Mr. Harvey to kill Mr. Davis. The letter itself explains that Mr. Davis testified in court against the Defendant and that the Defendant has obtained a "blue light" and "orange light . . . on his brain." The letter continues to instruct Mr. Harvey to explain the situation to the "GD" members in the prison and "stick" and "smash" Mr. Davis. Investigator Quick, Special Agent Flanders, and Officer Howell all testified that to stick someone was to stab him, and Special Agent Flanders explained that "smash" meant to attack someone. Investigator Quick and Special Agent Flanders testified that the blue and orange lights referred to approval from two separate gang authorities for the attack, which implied that the action was more serious than an assault; similarly, they stated that the phrase "on his brain" conveyed that the attack was meant to be more than an assault.

The Defendant next argues that "significant confusion" existed regarding the Defendant's authority to order a murder, noting that although Special Agent Flanders and Officer Howell referred to the Defendant's "OG" rank, Investigator Flanders mentioned a "triple OG" rank briefly during his trial testimony. This argument overlooks the fact that during the pretrial offer of proof regarding Investigator Quick's testimony, the State and the defense discussed that the State would not elicit irrelevant and prejudicial details of the Defendant's gang membership, specifically his triple OG rank, during the trial. Although

Investigator Quick spontaneously included the triple OG rank during his testimony—in spite of his having heard the trial court's pretrial instructions in this regard—it cannot reasonably be said that the law enforcement witnesses were confused about the Defendant's gang rank.

Regardless, in the light most favorable to the State, the proof established that an OG-ranked gang member had the authority to order a "lil homie" to commit an assault. The letter writer specifically noted that Mr. Harvey was a "lil homie," conveyed an OG order, and stated that it must be carried out as soon as possible. For the sake of argument, even if an OG might not normally possess the authority to order a murder, the letter writer's obtaining permission from two separate gang authorities added weight to the order to kill Mr. Davis and indicated that the action was sanctioned. The evidence is not insufficient in this regard, and the Defendant is not entitled to relief.

Next, the Defendant argues, without citation to authority, that "the constant factor [in solicitation] is that the other person actually receives and understands the communication. This requirement must be read as implicit in the language of the statute. Every line of [Code section] 39-12-102 describes a completed communication." In so doing, the Defendant ignores the plain language of Code section 39-12-1052(a), which also states that a person who "attempts to command, request or hire another" to commit a criminal offense with the intent that the offense be committed is guilty of solicitation. Whether Mr. Harvey received the letter is immaterial to whether the Defendant attempted to command him to kill Mr. Davis. The Defendant is not entitled to relief on this basis.[15]

Finally, the Defendant argues that without the testimony of a handwriting expert, it is impossible to confirm that he wrote the letter. The Defendant overlooks the fact that his DNA was found on the envelope. The Defendant's name and inmate number were on the return address. In addition, the general consistency of the handwriting in the 2012 and 2014 letters was readily apparent upon reviewing the trial exhibits. Lastly, the two letters contained the same idiosyncratic opening and closing phrases, indicating that the Defendant wrote both of them. The evidence that the Defendant authored the letter is sufficient, and he is not entitled to relief on this basis.

---

[15] The Defendant argues in his appellate brief that upholding his conviction "opens the door to prosecution for solicitation to commit a multitude of crimes a person thinks and writes about, but never sends." This comparison is inapt—the Defendant's letter was mailed and received by the prison in which Mr. Harvey resided, constituting a substantial step toward committing solicitation, i.e., criminal attempt. See Tenn. Code Ann. § 39-12-101(a)(3) (stating that a person commits criminal attempt by acting "intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense").

## CONCLUSION

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE